Next matter is Gunvalson versus PTCTherapeutics May it please the Court, my name is John Hutchinson and together with Kenneth Meyer, I represent Appellant PTCTherapeutics Inc. I'd like to reserve five minutes of rebuttal time with the approval of the Court. PTC is a small, 10-year-old biotech research company with no products currently on the market and some $100 million in losses over the past 10 years. PTC's most promising product is PTC-124, an experimental drug that PTC hopes will one day prove useful in the treatment of man-eating- patients. PTC's most promising product is PTC-124, an experimental drug that PTC hopes will one day prove useful in the treatment of man-eating-  PTC's most promising product is PTC-124, an experimental drug that PTC hopes will one day prove useful in the treatment of man-eating- patients. This is very complicated because it doesn't take a lot to dig down here to see that there has been no long-term safety trial for PTC-124. There have been no studies assessing its clinical benefit. You know, does it alleviate symptoms? Does it slow the progression of the disease? And we think under the applicable law, in the absence of clinical benefit, in the absence of proof of efficacy, harm cannot be established, whether it's irreparable harm or any harm, because it cannot be said that the drug will do anyone more good than harm. So... But if they make a good-faith assertion under paragraph 16 that the value to the individual affected with DVD by this mutation is in the hundreds of thousands, if not millions of dollars, I don't think anyone could argue with that. Isn't that enough to satisfy the patient? I don't know. I don't know whether... Clearly, this court and other courts have gone beyond a good-faith facial assertion and said you can do a factual investigation to look at the proofs. When you look at the proofs in this case, I think it becomes abundantly clear, as a matter of sort of undisputed fact, where these trials were, and as a matter of irreparable harm law or any harm law, that not having this drug in its current phase of development cannot be said to harm this individual at all as a matter of law. I can't imagine if this ever gets to the point of ultimate FDA approval that these arguments would be made. Well, but... That its efficacy is in question, its safety is in question. Well, they would... They're certainly in question until the trials which are currently being conducted are concluded. All right. Well, maybe we can move to the estoppel issue, which is... So, all I wanted to say is, Your Honor, I don't know if that is of... Looking down too far to the merits or of jurisdictional significance, but we do think it is true that there is zero harm under the applicable law. I don't mean to say I think it's of jurisdictional significance. Okay. I should probably also say, just to answer your question appropriately, under the applicable law, each of the plaintiffs has to meet the amount in controversy. I don't see how, given that you've asked this question, I don't see how John and Sherry Gumfelson meet that amount in controversy in their individual capacities, as opposed to as guardians for Jacob Gumfelson. It doesn't end the case, but I think it's probably the right answer. I'm sorry, Your Honor, you wanted me to address what issue? The estoppel issue. The reliance issue? The merits of it. Right. Yeah. On the issue of reliance, we've cited you to a number of documents showing that the Gumfelsons did not elect not to enroll Jacob in the Phase 2 trial, which is the only act of reliance they allege. Yeah, but there is a findings... There are findings effective that we are bound by, unless they're clearly erroneous. We have a record where the district court has said that these conversations occur... There are a lot of communications back and forth. The district court has focused on a couple, I guess in particular the dinner conversation, and extrapolated from that a commitment which was relied upon reasonably to the detriment of Jacob, and extrapolated from that an estoppel under the promissory estoppel laws concluded that there was a reasonable likelihood of success on the merits and granted the injunctive relief. Now, what's wrong with that? Well, first of all, I think you have to parse it. You have to look at what were the alleged promises, and what was the alleged act of reliance on those promises. And if I may take reliance first, and then address the promises, if that meets with Your Honor's approval. On the issue of reliance, the alleged act of reliance here was that by virtue of statements made in late 2005, and on July 13th, 2006, and at some points in 06 after that, the Gumfelsons made a decision not to enroll Jacob in this Phase 2A trial. When did enrollment in the Phase 2A trial close? The enrollment, I think, probably closed sometime in early 2007. So the act of reliance was not to enroll him in this Phase 2A 28-day trial. And as a result, the detriment is that he somehow could not be in the extension of that trial, which was limited to the original participants. What we have demonstrated to you is that long after the promises were made, they did seek to enroll him in the trial. So as a matter of law, they did not rely. And beyond that, after they sought to enroll him in the trial, it was determined by the primary investigator to the trial, having nothing to do with PTC, that he couldn't be in the trial. And when they tried to enroll him in the trial, the trial was still open to new enrollees? Yes, it was. What had happened, just to be clear, is the trial, they took more enrollees. They started, I believe, with six individuals for the 28 days on a low dose, and then they had 20 more individuals, and then they opened it up to 12 more individuals on an even higher dose, all part of the same trial, Your Honor, but where they subscribed it to more people. So there were a total of 38 people by the end. So after the alleged promises were made, they did seek to enroll him. And after they sought to enroll him, a decision was made that he couldn't be in the trial, having nothing to do with anything said by PTC. And that's irrefutable. That's undisputed. And we know this because we have cited you to a number of contemporaneous documents that Mrs. Gunfelsen wrote in December of 2006 and January of 2006, and those are Joint Appendix 369, 363. What are the dates of the documents? I remember the dates of the documents. I don't remember where they were in the appendix, but what are the dates? Are you talking about emails? Yes. They're all in December of 06 and January of 07. But I'd like to call your attention to one, Your Honor, if I might, and it's Joint Appendix 369. It's dated December 8, 2006. After the Gunfelsen seek – it is written after they, in fact, months after the alleged promises, and after they did, in fact, seek to enroll him in the trial, and after Dr. Finkel says he cannot be in the trial, Mrs. Gunfelsen writes to Ms. Furlong, while you were flying yesterday, I got a call from Dr. Finkel telling me he did not select Jacob for the trial. She then, at the top of that document, in a separate email on the same date, she writes to Ms. Herowat and says, other than Jacob's diagnosis, this news has been the worst. And expresses how hard it is for her to – And obviously, these are not – this would not be the sentiment of someone who has decided not to participate in that trial because of something we said to her. She clearly wants to be in the trial, and the decision is clearly made by someone else that she can't be in the trial. So as the district court evaluated this evidence and said, well, maybe Dr. Finkel was wrong, or Mrs. Gunfelsen, who is a registered nurse, is not a medical doctor. Well, that really missed the point, respectfully. The point was that there was no election decision that they made or did not make as a result of anything that PTC said. After PTC allegedly said what it said, they still went ahead and tried to enroll him. And after trying to enroll him, someone else made the election decision, so they didn't forego doing anything. They argued for the first time on appeal that they could have sought to enroll Jacob in the same trial in another city. And so maybe that could be an act of reliance. Aside from the fact that that was never alleged below or in the complaint, and the fact that it's sort of nonsensical to allege, well, we didn't rely on the statements when we went to Dr. Finkel to try to get him in the trial. But when Dr. Finkel said no, then we relied on those months earlier statements to not have him go to another city in the trial. We think that's sort of nonsensical. But beyond that, again, Joint Appendix 369 takes care of the issue, because in that document, Mrs. Gunfelsen makes clear that it was Ms. What's the date of that document? Excuse me, Your Honor? The date of that. You mentioned you gave the date. It's, again, December 8th of 2006. Okay. In that document, Mrs. Gunfelsen again makes clear that it was Ms. Herowat who recommended continuing to pursue the trial in another city, not as respondents would lead the court to believe, saying, don't bother doing the trial. It will have no effect on any other trials. So we believe respondents not only failed to prove reliance, the documents actually conclusively refute that there could have been reliance. There's also the January 30th, I guess, email to Herowat, which Ms. Gunfelsen has stated, quoting, Jacob cannot be in the trial due to his dystrophin production. Right. He produces too much dystrophin. Exactly the same, Your Honor. There were five documents. There were 369, 363, 371, 370, 355, and 99. On the issue of the promises themselves, respondents contend that Ms. Herowat told them not being in the 2A 28-day initial trial would somehow have no consequence at all, including respondents would have the court believe, with respect to any extension of that trial. So the fact that the extension of that trial was limited only to the original participants was somehow alleged to be inconsistent with what Ms. Herowat said. This, again, is refuted by another document written by Ms. Gunfelsen. That's JA 370. Also, again, Your Honor, dated December 8th of 2006, in which Ms. Gunfelsen wrote, it's not the 28 days that worries me so much, but it's my understanding that group might be the last chance for him to be in a long-term trial without placebos. So the document clearly shows, well after these alleged promises by Ms. Herowat were made, that the initial Phase 2 group might be extended to a longer-term trial, and that Jacob would likely be excluded from that extension of the trial if that non-participation in the 28-day 2A phase trial, he would not be excluded from a longer-term placebo trial. And, Your Honor, that is precisely what occurred. He was excluded from the sort of grandfathered extension Phase 2A trial, but he was free, he was not, by virtue of not participating in this 28-day trial, he was free to participate in this 2B placebo trial that Mrs. Gunfelsen did not particularly want to participate in at JA370. He was excluded from that trial because he was not ambulatory by the time it occurred, but they don't claim there was anything inconsistent in that exclusion with anything Ms. Herowat ever said to him. So the idea that he thought he would not be excluded in an extension... Part of what they're arguing is that the reason he was not ambulatory for that trial is also traceable to the reliance because they held off and did not act more forthwithly, forthright, based upon representations, and therefore by the time he would otherwise have been okay for the trial, he was not ambulatory. Yeah, I just don't think that's pointed out by the facts, Your Honor. He's alleged to have become non-ambulatory in March of 07. We know long after these promises were made, they did try to get him in the trial in, say, November of 06. We know in December of 06 that Dr. Finkel decided he couldn't be in the trial. So all the alleged reliance took place before he became non-ambulatory. The fact is they just didn't rely on anything we said. Excuse me, it's not relevant to our decision here, but what is happening with the anticipated Phase III trials? What is happening right now? They're ongoing. I think the record would indicate that there's a first look, Your Honor, at I think after 90 people in the Phase IIb trial, that's the placebo trial, after they've had the drug for six months, there's a first look. And I think that's sometime, I want to say, mid-2009. Just if I could briefly talk about the other set of promises are the access promises. And we think those promises, as a matter of clear law, you're going to get the drug, undefined by time, undefined by when, undefined by how, do not remotely meet the threshold of a clear and definite promise. They've cited to this Pops Cones kind of line of cases that says, well, you can meet it with less. You can never meet it with less when you're seeking the object of the promise. You've got Lobiondo on your side, don't you? Absolutely. Lobiondo is the case that sort of puts Pops Cones in perspective and says, no, no, no, not when you want the thing that was promised to you. Then we are going to hold you to a rigorous burden on the promise. If all you want are some kind of reliance damages, some sort of out-of-pocket expenses, we might relax the standard. But that's not this case. And we have cited to a number of cases that say, when you have a promise that's not defined by time or amount or manner, it can't be enforced. But just to call your attention again to two more documents, JA 361 and 362, they're critical documents because they are mishear about saying exactly the opposite in writing of what was allegedly promised. She says, we don't have a development plan. We don't have a pre-access program. We're not in a position to do anything. We'll let you know when. I don't know how more definitive you could be. It makes abundantly clear that the program is not in place, and clearly nobody is contemplating getting Jacob Gumbelson, among all other similarly situated boys, being the one individual in the world who's going to get the drug alone outside of a clinical trial. These documents make clear that these promises were not made. Just finally on irreparable harm, I think the district court really went much further than the law on irreparable harm. We think the cases are, the court basically said, if you have a serious illness, that's irreparable harm, without any discussion of the viability of the treatment or drug. What the case law clearly requires is that the drug be at a stage where you can say not having it will do more harm than good, or having it will do more good than harm. In the absence of clinical benefit and efficacy data, that determination cannot be made, and where these trials are, as in the cases we've cited, as a matter of law, this would not comply. The cases they've cited, which don't really even involve new drugs, they sort of involve new treatments of existing drugs, those drugs have, there's literature on them, there are articles on them,  this drug has not been found to be efficacious at all beyond a 28-day study and a three-month study on 17 people in Israel. And there is a contraindication, as I understand it, for compromised kidney or heart problems, and there's some medical records here to suggest, and I think that was maybe some of Dr. Finkel's thinking, that there is a... I think that's a slightly different point, Your Honor. There was, in the medical records that Mrs. Gunfelsen furnished when she was trying to get Jacob into the trial that they claimed they weren't trying to get him into, his medical records from his personal pediatrician, A, said he had Becker's muscular dystrophy, not Dr. Finkel, and B, said he had some of these health problems. Those were not the product of the trials. Oh, no, I wasn't suggesting they were the product of the trial. I was suggesting that that was, I thought, maybe I misread it, part of the determination that in any event, he simply would not have been eligible for the trial. It certainly weighed into Dr. Finkel's analysis. I think Dr. Finkel says, hey, you gave me a bunch of medical records. Your own physician says for six years into this, he's got Becker's muscular dystrophy. That's disqualifying. Also, he has a heart issue, so I would have disqualified him anyway. But not just to be clear, whether or not Dr. Finkel was right is not... No, we understand that, and it appears that he was not right about the Beckers. Well, I don't think we know whether he was right or not. I don't think there's any evidence in this record that he has had a sufficient test to make a conclusion one way or the other. Okay. Thank you. But thank you for your time. Thank you. May it please the Court, my name is Mark Woll, and I represent the Gundelsens in this matter. Judge, before... or may it please the panel, before we begin, just to close the loop also on the jurisdictional basis that Your Honor had asked about, one other aspect of the jurisdictional threshold is presented by the case of Golden v. Golden, which deals with punitive damages, and there are punitive damages allegations in this case. Right, and we can combine the two. Right, they can combine the two, and not only that, but in that case, which was also then quoted in the Huber v. Taylor case as recently as July of 08, this Court has held that a punitive damage allegation, unless frivolous and without merit, is typically sufficient to satisfy the jurisdictional threshold, because at that point you would not be able to conclusively determine that the amount in controversy would be less than $75,000 or less. Right, okay. Turning to the reliance issue that was raised by PTC's counsel, there's been a blurring of the facts here that I would like to elaborate on. The most important thing, which is completely absent from PTC's argument, is that there were multiple enrollment opportunities. The first enrollment opportunity that we talk about in this case occurred in October, or the end of 05. Okay, everything that they rely upon deals with Dr. Finkel's alleged review of documents in the end of 06. But the fact of the matter is, in the end of 05, or in the fall of 05, there's an enrollment opportunity, and it's specifically raised at the time whether it's worth taking Jacob off Gentemeyerson, and at the same time, whether or not he would be prejudiced by not enrolling in the Phase 2 trial at that time. Now, in reliance upon that, there's no dispute in the record. There's no facts whatsoever that they have offered that deal with that issue. It is undisputed, based upon the affidavits and the evidence in the record, that at that time, at that enrollment opportunity, they did not enroll him, A, because he was still on Gentemeyerson, they didn't take him off, and B, because they were assured that his non-participation wouldn't prejudice him from future clinical trials. But it's extended by the two things. One, here's the affidavit of the declaration from Dr. Finkel expressing that he told the parents not to take Jacob off of Gentemeyerson. But getting further into the reasonable reliance, and one thing that concerns me in reading this, the reasonable reliance seems to me goes to statements not by Finkel, but by agents of PTC. Absolutely. I agree with Your Honor. How could any representation from the pharmaceutical company reasonably suggest that it would overcome qualifications on eligibility by principal investigators? In other words, if the principal investigators are saying that you have to establish A, B, and C to become eligible, and that's conveyed to the parents, and the agents of PTC assume that they're saying, we will get your son into the clinical trials, wouldn't the qualifications on that that would be inherent in the representations of Finkel and the principal investigators qualify that so that it would be reasonably known that whatever they said at PTC, that the son has to qualify for those trials before he can be admitted to the trials? There's a couple things I'd like to break out on that. First of all, the alleged promises that we're talking about, there were some promises that deal with access to the drug, not necessarily specifically through a clinical trial. So, we can take that apart. But there were some promises from PTC though, right? So, if the drug was contraindicated, but the PTC folks are saying you'll get access to the drug, especially, and I didn't realize that Ms. Gunvalson was a nurse, and they would clearly know, reasonably be expected to know, that whatever access they were being offered had to be subject to medical eligibility. Absolutely. In the clinical trial documents that are registered with the FDA, there are certain steps that need to take place before one can get into a clinical trial. And that's one of the reasons we take a lot of issue with what Dr. Finkel said in 06, but I'll get to that in a moment. For purposes of getting into the clinical trials, the question is you have to have a physical, you have to be examined, you have to have muscle biopsy. There's certain things that need to be done. So, what happens in 05, when they find out about this, forget that the reliance is not on what Dr. Finkel said. They took Dr. Finkel's statement into account that, hey, it's not worth taking off genomycin. But the critical inquiry then becomes to PTC's Vice President, Ms. Hirwat, who Ms. Gunvalson was dealing with, that says, look, I now want to know, am I going to be prejudiced? Because the obvious reason for asking that is, yes, if you are going to be prejudiced by doing that, then we will go through the muscle biopsy, we will go through the physical examination, and we'll go through everything that we need to do to establish ourselves eligible for the trial. But they didn't do that. Mr. Woolen, before we even get to reliance, we have to begin with the first things, and that is the law does require, the law of New Jersey, does require a clear and definite promise, doesn't it? Would you agree that the Lobiondo case that I cited when your adversary was up at the podium is applicable here? It's a 2003 case. The Lobiondo case goes back to Also a case that involves specific performance. The Lobiondo case, I have read that, and it also refers back to pop cones. And in pop cones, there's a quote that says, and PTC relies on pop cones, which I believe Lobiondo cites back to. In pop cones, they claim that it says there's a specific differentiation between whether you're trying to specifically enforce a promise or whether you're seeking damages. And that's not what the pop cones case says. If you go back and look, there's a qualifying part of the sentence that is quoted by PTC that is missing. What the court says, it does in pop cones talk about the relaxed standard and says, and in particular for those matters that involve a claim for damages as opposed for enforcement of the promise. And so what is your point in the apparent distinction you draw between the earlier pop cone decision and Lobiondo? What I'm saying to the court is I think that it appears that from New Jersey jurisprudence that while the law started out as a clear and definite promise, it has been somewhat eroded. But in this case, I don't think that it's really germane because the clear and definite promise that we have came from Ms. Herowat to Ms. Gunvalson, because the act... Which was? And that's the critical distinction I'm trying to impress upon the court. It happened twice. There were two separate enrollment opportunities. The first enrollment opportunity was in 05. A year before, Dr. Finkel looks at any medical records or anything. And in 05, and it's undisputed. It's not disputed by Ms. Herowat. It's not disputed by Ms. Gunvalson. And in fact, these are the very factors that Judge Martini focused his attention on. If you go back to the record, in Judge Martini's oral opinion, he specifically calls out that I studied Ms. Gunvalson's affidavit very carefully. It's undisputed that in both affidavits, there are multiple promises made. And the fact of the matter is, if he was enrolled in 05, if she did not rely on Ms. Herowat's promises in 05, we wouldn't be here today. Because the only reason, the only reason, and you haven't seen any evidence to the contrary from PTC, that he cannot get into the Phase II extension, is because he was not in the earlier one. Which is the very harm that Ms. Gunvalson was trying to prevent against when she asked Ms. Herowat about that. So, the 05 promise, in and of itself, I think is dispositive of this matter. Because had she not relied on that, then we wouldn't be here today. She did rely on it. He didn't get into the trial. And now he's excluded from the Phase IIa extension because he wasn't in it. And in fact... If you're right about that, how would that 05 reliance have been reasonable? Because you're assuming that any commitment that was made was unqualified, or that any qualifications that were put on it were not such as to suggest to a reasonable person that they ought not to rely upon it. How was that an unqualified commitment in 05? I'm sorry, what was... You're saying the representations were made in 05 upon which your clients relied. Absolutely. And I'm saying under estoppel, the reliance has to be reasonable. And the commitment has to be unqualified, as Lobiondo says and Judge Smith has asked you about. On this record, I'm asking you, how would we find that any 05 commitment was an unqualified commitment, as opposed to if he is found eligible? Well, I think the key is she refrained. In fact, the two critical cases that we cite, which are not addressed by PTC in reply, are the cases that deal with in-futuro promises that talk about if based on promises you refrain from engaging in certain conduct, then those promises are enforceable. And so, I think to answer your question, at that point in time, she refrained from having the muscle biopsy done. She refrained from the physical examination because she was told, look, it's just a 28-day trial. You're not going to be prejudiced down the road by doing this, and you're already on gentamicin. And, you know, so at that point, she says, fine, in reliance on the fact that I'm not going to be prejudiced, I'll sit tight for the time being. So, if she was told at the time. So, it appeared at the time that gentamicin seemed to be having, I'll say satisfactory in quotation marks. It clearly wasn't satisfactory. Well, what the undisputed fact that we have in this case is that she had been advised by Dr. Sweeney of University of Pennsylvania, who's also, I believe, a PTC director, that PTC-124 was more than 12 times as effective as gentamicin. So, that was the exact reason why that there had been some concern. So, in 05, she forbears from doing anything. And that's the Maza case, and that's the Concannon case. And those are not addressed at all by PTC in reply. And I would like to direct the court to take a look at those for the propositions for which we cite them. What then happens in 06, okay, is there is a separate enrollment opportunity. There's a lot of things that happen between 05 and 06. First of all, Jacob's condition continues to deteriorate. It's getting worse. In the meantime, they have now been PTC-124 in March of 06 is now granted fast-track status by the FDA, meaning that PTC has convinced the FDA that PTC-124 is reasonably likely to predict clinical benefit. That happens in March. Subsequent to March, you then start getting results back from the PTC clinical trials that they've done. And they start finding out, hey, there's increased dystrophin production, which is the whole issue here. There's increased activity. There's increased endurance. These are all factors that are now indicating that, you know what, there is some, this drug is doing what it's supposed to do or what they suspected it will do. And so what happens is, and then, by the way, PTC then changes the enrollment criteria. From 05 to 06, the enrollment criteria changed. In 05, it was open only to ambulatory patients. It was not open to wheelchair patients only. So for them to do that subsequent opportunity in 06, they had to change the criteria with the FDA. They also changed the dosage levels. So there were, it was a complete set of, it was a completely separate enrollment opportunity. So what happens at this point is Ms. Gunvalson says, I want to make crystal clear that I'm not going to be hurt by this. And so if she, because she's concerned that if she doesn't say anything about it, then it may be a problem later on. Because they'll say, well, you may have asked in 05, but you didn't ask again in 06. Now with regard to the documents referred to by Mr. Hutchinson, if you go back to the December 8th, that's at the time that Dr. Finkel looks at the records. Okay? At that time, after he looks at the records, yes, Ms. Gunvalson is seriously troubled. And that, if you look at Ms. Hero-Watt's affidavit, is exactly when the next representation was made by her saying that you won't be harmed. She says that the conversation took place in late 06. And it's consistent with those documents. Because now, after Dr. Finkel has made that determination, if Ms. Gunvalson were resigned to the fact that, oh, he can't do anything, why would she go back to Ms. Hero-Watt to say, is there anything else I can do? If she was resigned to the fact that, if she was relying on Dr. Finkel. There would be no reason to go back. But the fact of the matter is, even after Dr. Finkel says no, which does turn out to be erroneous based upon Dr. Wong's examination of Jacob, she nevertheless goes back. She nevertheless asks her again, as in the record, about the implications of taking him off gentamicin. These are all consistent with the fact of whether or not she can proceed. And one other fact that's worth just pointing out for the record, and I realize I'm just about out of time, but Dr. Finkel is only the investigator. There's clinical trials going on at three locations. Dr. Finkel is only involved in one of them. He has no say at all in the other two. One's in Cincinnati, one's in Utah. And so, it's clear that Ms. Gunvalson does not end the campaign when told by, when erroneously told by Dr. Finkel that he's got BMD. She continues to have discussions with Ms. Hirawat, and in fact, I think the records referred to by Mr. Hutchinson support that. Because if she had just simply relied on what Dr. Finkel said, there would be no reason for her to have those additional conversations. If you were right, if you would have revealed, from a policy perspective, what is the result of the whole thing? Are we in a situation then where a court is ordering someone into a clinical trial, perhaps, against the medical advice of a principal investigator? Absolutely not. In fact, the remedy here is, does not impact the clinical trial at all. Because you want it outside of the trial. Right, right. The whole purpose of the compassionate use regulation is that the clinical trial can run, and whatever data that you obtain from the single patient use IMD does not impact the clinical trial in any shape, manner, or form. But it has to be reported back to the FDA. Absolutely. In fact, and one of the things that I'd like to just make a quick point on with respect to that, PTC in its papers talk about unfettered access to PTC-124, that the district court just basically opened the vault to Jacob. It's not true at all. What has to happen, so the record is clear, is the only thing that Judge Martini's decision does is give, is to prevent PTC from reneging on its promises. But what the Gumbelsons still need to do is to convince the FDA to grant it a single patient use IMD, and to have an institutional review board do that. And if those entities say no, then it's done anyway. So, it's not unfettered access to PTC-124. So, the FDA is monitoring the clinical trials. It's monitoring the data. It's already made determinations based upon PTC's representations that PTC-124 is reasonably likely to predict clinical benefit, and they're seeing the positive results of these trials. The FDA and IRB will now make the decision of whether or not they're going to permit a single patient use IMD, and they're also going to dictate the dosages and the times and everything else. So, to suggest to the court that there's just some sort of, you know, unfettered access, bring the truck up to PTC's doors and just take as much of the product as you want is completely untrue. Mr. Wallin, thank you very much. Thank you very much. Just a few points, if I may. On this multiple enrollment opportunity, I just want to be clear as to what the record is. There was one trial, one phase 2A 20-day trial, 28-day trial. It's alleged that the Gunfelsons considered enrolling in that trial in late 05 and in July of 06. And it is undisputed that after July of 06, they did seek to enroll in the trial. So, the fact, even if it were true, the fact that they didn't do it in 05, but they waited until after July of 06, is of no consequence. They sought to get in the trial. What about Mr. Wallin's statement? I think he's right that if he was to prevail today, it would not necessarily mean that the Gunfelsons would be entitled to this, that Jacob would get the drug. It still has to go through the FDA for approval and be cleared by an institutional review board. If that's true, then what is the harm to PTC's clinical trials if they prevail? Well, there's multiple harms. Let me talk about the regulatory process and then sort of what we think the larger harm of this ruling was. In terms of the regulatory process, the FDA has determined that the public interest is that there will never be compassionate use without the consent of the company. That is an absolute threshold before you ever have a compassionate use. And that is what the determination has been made. That is in the public interest. So, are you saying that if they were to prevail, the FDA would not approve it and move it to the institutional review board because you wouldn't agree? I don't think I am saying that. I'm saying that when things come to the FDA that have to do with compassionate use or preapproval access, they always come in the guise of the company supporting it and the company talking about some of the things that the FDA wants to hear about. Like, will it adversely affect the trial process? PTC denied Mrs. Gunvalson's request for compassionate use. Why? PTC, for several reasons, because the company feels very, very strongly until there are sufficient trial results that demonstrate the long-term safety of the drug and some degree of clinical benefit, it is inappropriate to have any compassionate use program. But why isn't that their decision? If they're willing to take the risk, knowing the drug may not be efficacious, there may be some medical risk. I mean, clearly, when you talk about the situation, the risk, you've got to admit, is the outlook for Jacob, absent any change, is pretty grim. So, how much risk is involved here with this drug? Well, the problem is for many hundreds and thousands of other patients for DMV and cystic fibrosis is also pretty grim. But with respect to the response, well, you know, if he's willing to take that chance, the regulatory framework is the company needs to think it is both in the best interest of the person and also its trials. And then wouldn't that mean that it would go to the FDA, you would make that argument, oppose it, the FDA would hear it, may or may not grant it? Well, that's a very interesting question. I mean, first of all, we have determined as a company that this will threaten the clinical trials. It will. We may have to have future trials. So you told the FDA that they would understand that better than this court. It may or may not disagree. I mean, I guess I don't quite understand. I think that determination is for us to make. But separate and apart from that, I'm not sure how Judge Martini would react to a mandatory injunction that was issued against us and then go and tell the FDA not to approve it. Well, you know what? Our job is to affirm or reverse. And sometimes judges get bent out of shape, get noses out of joint. When we reverse, sometimes they don't. But are you saying that we need to take into consideration the feelings of the judge? I don't mean his feelings. I don't know if he would view our trying to persuade the FDA not to approve this, which we would do, as consistent with compliance with the injunction. That would be easy. But in any event, Your Honor, I mean, we have determined that it will threaten the clinical trials, that it is premature and unsafe to do this, particularly through this pediatrician who, when he sent medical records to Dr. Finkel, and the records did not magically appear there. They were sent by Mrs. Gunfelsen. This pediatrician thought Jacob had Becker's muscular dystrophy, not Dr. Finkel. But if I can just go back to the reliance prompt, there was one trial, whether he sought to get into it in 05 or he sought to get into it in 06, he sought to get into it after the alleged promises were made. You were told today, well, maybe they said it after Dr. Finkel got the records. Dr. Finkel got the records in November and December. If you look at page 60 of the joint appendix, and I believe it's paragraphs 24 and 25 of Mrs. Gunfelsen's affidavit, she could not be more specific that the promise that was made here, the alleged promise, was made on July 13th. No equivocation. 05. 06. After July 13th, they sought to enroll him in the trial. And then Dr. Finkel, so right there the reliance is cut off. Then Dr. Finkel said he could not be in the trial. It doesn't matter whether he's right. He has that discretion. We are not making the decision. There's no allegation that we had anything to do with that. It was not their enrollment decision to make. So they engaged in no acts of reliance. And then you said, well, maybe they could go to another city. Well, as we've told you, that's what Ms. Heroette suggested she do. With respect to the promises themselves and their specific and definite nature, it's not just the Popcones case that clearly delineates this distinction between do you want the promise to be performed or are you trying to get some kind of reliance compensation? It is LoBiondo, which says this is exactly what happened in Popcones. And you can't read Popcones for any other proposition. LoBiondo says what Popcones means. Absolutely. I think it's a little wired to take the more recent case in the gloss that the very same court placed on its own precedent. And we've cited the aircraft inventory case, the Cartham case, those are cases that say if you don't have a date, if you don't have a time frame, if you don't have details, like I'm going to sell you the plane if I sell the plane. Well, you don't have warranties. You don't know what the warranties would have been. Here it is. Well, you'll get some access to the drug. First of all, we believe that is refuted by the unequivocal documents. But even if it were made, and it wasn't, even if it were made, as a matter of law, that cannot be an enforceable promise. These were not mistakes of fact. The facts are clear. The documents speak for themselves. This was a misapplication of law as to what could constitute reliance. And this case is not about PTC's desires uniquely to prevent respondents from having access to PTC for their son, but it's about preserving PTC's ability to complete the necessary clinical trials for PTC-124 as swiftly and efficiently as possible, so that it can make the drug available to the larger patient community, including Jacob, if and when there's sufficient evidence developed, which does not exist now, that the drug is safe for long-term use and provides a clinical benefit to patients. Thank you, Your Honor. Thank you for your time. Thank you very much for your helpful argument. We understand that this is a case, we see a lot of cases with urgency attacks. I don't think I've seen any with, except for the death penalty cases that we see that are with this appending execution. I don't think we see any that are more time-sensitive than this. So we have not conferred in this case. What we have agreed to do before argument is to confer right now. We may be able to reach a decision. We may not be able to reach a decision. If we can reach a decision that two of us at least are comfortable with, we'll rule right now from the bench. If we can't, then it's possible that we can't get a judgment and we're going to have to circulate memos and do those kinds of things. But assuming that we can, I took the liberty of basically, and I'll get into this in more detail down the road, preparing two drafts, and if we can reach an agreement, that will determine which of the drafts I will read. I have an opinion, a very brief opinion from the bench issued in order right now, and then either side will be free as of today to vote for a petition for re-hearing. But I really don't want this thing to drag on. None of us want this thing to drag on anymore. I mean, the end listeners deserve an answer. You deserve an answer. So why don't we take about 20 minutes, 15 minutes? Why don't we take about a 20-minute break, which may or may not be enough, and then we'll reconvene. Thank you, Your Honor. Thank you. Everybody's here, I guess. We're back in session. And just a few brief words. We were not able to give this case the attention and serious concern it requires in the amount of time that I called the break for us. So we will continue our deliberations. But again, we're aware of the time deadlines. And I would hope that we can decide the case either later on in the day or possibly more likely tomorrow and have an order filed. But that will allow us to more thoroughly address some of the intricacies that are at work here. It's not fair to either side to try to, even though there are time concerns, to try to do this in an answer from the bench. I will, however, say, and I'm now only speaking for myself, although I wouldn't be at all surprised if one or both of my colleagues joined me, we're obviously concerned about what's at stake here. And I want to assure both parties, no matter what happens, from the side of PTC, if an opinion which is presidential, maybe it would have to be presidential, I don't know. But assuming there's jurisdiction, assuming we get past that hurdle, anything that would be written would be cognizant of the possible impact it could have on the clinical trials here as well as the pharmaceutical industry in general. And we'd try to certainly be cognizant of that in anything that we write so as not to jeopardize the trials for 124 or, as I said, for other pharmaceutical companies. And to the Gunvalsons, that if the opinion comes down and you do lose, which I'm not suggesting that you would, please understand that our job is to apply the law as is given to us. We're not the Supreme Court of the United States, so we're locked into statutes. And actually here it's the State Supreme Court you have to worry about. At least for myself, I view your struggle here as nothing short of heroic, incredibly courageous, courage that's the kind we rarely see. And that includes the incredible courage that Jacob has demonstrated throughout this incredibly torturous lawsuit, and I'm sure it's been torturous for you. And if you were to lose, and again I'm not suggesting you will because I made similar remarks to PTC, at least for me you will always remain in my heart, in my thoughts, I wish you the best. There are times when being a judge is a lot more fun than other times. This is not one of those times where it's a lot of fun being a judge because we have difficult issues to weigh many times. But boy, this is not an easy one to decide. Again, no matter which way it goes, because the human dynamics here are just incredibly compelling and tragic. And Jacob, at least for me, again I commend you on your incredible courage and your struggle. And no matter which way it comes out, we certainly wish you the best. And again, only speaking for myself, I wish that we were in a position where we were not as encumbered by legal principles as we are, but we are. And again, to PTC, we are mindful of your position and would not want to do anything that would interfere with, if the Gunvalsons do win, we would certainly not want to do that in a way that jeopardizes your trials and we will try the extent we could to write anything narrowly. So with that being said, kind of as something that I felt obligated to say to both sides, and particularly the Gunvalsons, because I've been incredibly touched by the struggle from the time I first picked up these briefs. And again, my heart goes out to you, it really does. But I wanted to say those closing words. We'll continue our legal deliberations, and it's a shame. I guess this case shows how sometimes humanity can be divorced from concepts of law and justice. And the problem with doing that is that everybody's sense of justice is different, and that's why we have statutes, that's why we have case law to follow. But this is one, I think, that really requires a more humane situation that the law may or may not allow us to get to. I just don't know the answer to that, and we'll continue to hash this out. We've got one more case to hear, and we'll hear that, and then we'll go back to our deliberations. So, Mr. Archinson, thank you very much. Mr. Wallen, thank you very much. Mr. and Mrs. Gunvalson, this is totally out of character, and I'm sure some will criticize you for doing it, but I want to thank you all so very much. And Jacob, I want to thank you for coming here today and for just everything that you've endured and everything you continue to endure in the incredibly gracious, remarkably gracious way that you've been able to endure it. So we have our thanks for that, at least you have my thanks. And I wouldn't be at all surprised if my colleagues joined in with that. I've got two kids pretty much about your age, so I can somewhat sympathize with the incredible pain that your mom and dad have been dealing with this. So thank you very much, and good luck with everything. Thank you, Your Honor. Your Honor, may I just ask a quick question? Would the court prefer that we remain here or not? No, we really need to—it's not that close. Okay. Yeah, we really need to wrap it up. I just wanted to make sure that you were— Yeah, no, nice try, but we're not— Thank you. All right.